UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM TOLLIVER,

Plaintiff,

v.

ABSOLUTE,

Defendant.
_________________________/

COMPLAINT

## I. Introduction

1. Plaintiff is a victim of credit identity theft, whose stolen personal and financial information was used to create a counterfeit account and debt. Defendant and its employees and agents are debt collectors and credit identity thieves who acquired the counterfeit account and (while falsely claiming to be attorneys) contacted and falsely threatened plaintiff with litigation, prosecution and other adverse consequences, unless plaintiff paid defendant money to satisfy the non-existent debt, in violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*

## II. Jurisdiction

2. This Court has jurisdiction under 15 U.S.C. § 1692k(d) (FDCPA), and 28 U.S.C. § 1331. Venue in this judicial district is proper because the pertinent events took place here.

## III. Parties

3. Plaintiff William Tolliver is an adult, natural person residing in Kent County,

Michigan. Mr. Tolliver is a "consumer" and "person" as the terms are defined and used in the FDCPA.

4. Defendant Absolute is an active, unregistered and unidentified entity, operating from an unknown location. Absolute uses interstate commerce and the mails in a business the principal purpose of which is the collection of debts. Absolute regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Absolute is a "debt collector" as the term is defined and used in the FDCPA.

5. Defendant operates its debt collection scheme using multiple, unregistered names, including: Absolute, Absolute Mediations, and CRS.

6. Defendant and its employees and agents have used multiple toll-free telephone numbers to contact and falsely threaten plaintiff and other consumers with litigation, prosecution and other adverse consequences, including: 855-203-4819; 855-203-0275; and 855-230-4689.

7. All three telephone numbers are registered to a "Responsible Organization," non-party Bandwidth, Inc. ("Bandwidth"), through the Federal Communications Commission's North American Numbering Plan.

8. Bandwidth is a reseller of toll-free telephone numbers, assigning its allotted toll-free telephone numbers to its customers.

9. According to Bandwidth, allthe three telephone numbers were assigned in 2019 to non-party SIP.US LLC, as follows:

a) 855-203-4819 assigned April 12, 2019;

b) 855-203-0275 assigned May 3, 2019; and

c) 855-230-4689 assigned April 12, 2019.

10. SIP.US LLC ("SIP") is a Delaware limited liability company, with its principal business address at 3005 Royal Boulevard South, Suite 120, Alpharetta, Georgia 30022.

11. SIP maintains an internet website, www.sip.us, that explains the services provided by SIP. According to the website: (a) SIP provides its customers with telephone services over the internet using Voice over Internet Protocol (VoIP), including the use of toll-free telephone numbers that the customer can instantly add to the customer's account through the customer's control panel; (b) SIP allows its customers to pay with MasterCard, Visa, Discovery, and American Express, as well as through ACH processing once the initial account deposit is made; and (c) SIP does not store any credit card information on its systems and instead utilizes "the Authorize.net Customer Information Manager (CIM) service which tokenizes and stores our customers' sensitive payment information on the Authorize.net secure servers."

12. SIP has knowingly marketed its services to entities that run the scam that is described in this complaint and touted the anonymity that SIP provides to its customers.

13. Authorize.net LLC ("Authorize.net") is a Delaware limited liability company. Authorize.net is a payment gateway service provider, through which merchants accept credit card and electronic check payments via the internet. Authorize.net provides payment processing services to hundreds of thousands of online business around the world. Authorize.net is owned by CyberSource Corporation, which is owned by Visa Inc.

14. According to the Authorize.net Privacy Policy as stated on its internet website, www.authorize.net, Authorize.net collects "Personal Information" any time its payment processing services are used, including but not limited to: "Consumer Name; Contact information (such as email address, phone number, and mailing address); Order and payment

information; IP address and information about the device used to access the Services; How and which Services are used; Merchant and merchant account information, including account information we may gather from third party sources; and Information provided to us through means such as social media or when you contact us through our website." The website also states that we share Personal Information with third parties as necessary "To comply with law or other legal obligations such as responding to subpoenas . . . ."

15. Defendant and its employees and agents used the three toll-free telephone numbers and related services provided by SIP to contact and falsely threaten Mr. Tolliver with litigation, prosecution and other adverse consequences, unless Mr. Tolliver paid money to defendant to satisfy the non-existent debt.

**IV. Facts**

16. In or about 2009, plaintiff William Tolliver accessed the internet and visited an internet website in contemplation of borrowing several hundred dollars for a term of several weeks, with interest at an annual percentage rate that exceeded 350 percent, in what is commonly known as a "payday loan." Any money borrowed by Mr. Tolliver was used by Mr. Tolliver to purchase goods and/or services for personal, family and household purposes.

17. The internet website visited by Mr. Tolliver was one of hundreds of commonly owned and operated internet websites offering to make payday loans to consumers. As part of the loan application process, Mr. Tolliver, provided the operator of the internet website with his full name, date of birth, Social Security Number, residential address, telephone number, email address place of employment, and references, as well as his banking information including account numbers.

18. However, the operator of the internet website did not make loans to anyone and

instead functioned merely as a "lead broker" or "lead generator." According to the Federal Trade Commission: "In the online payday lending industry, many consumers do not apply for online payday loans directly on the lenders' websites, but often apply on third-party websites that collect consumer loan applications, which include sensitive consumer data like bank account numbers and social security numbers. The consumer applications are generally known as 'leads' in the online payday lending business, and are often sold to 'lead brokers' or 'lead generators' who auction off the consumer data using a computerized bidding system." In this instance, Mr. Tolliver's personal information or "lead" was acquired by a lead broker named Joel Jerome Tucker, and his company JT Holdings, Inc., formerly known as eData Solutions, Inc., formerly known as BMG Solutions Ltd., formerly known as Bahamas Marketing Group Ltd.

19. According to the Federal Trade Commission, beginning in 2014, Mr. Tucker and his companies implemented a scheme to defraud consumers in which they (a) accessed the personal information or "leads" that they had obtained over a period of years from consumers through their dozens of payday loan internet websites, (b) used that information to create hundreds of counterfeit debt portfolios that purported to identify millions of consumers who had defaulted on payday loans, and (c) marketed, distributed, and sold the counterfeit portfolios to debt buyers and other debt collectors. See *Federal Trade Commission v. Joel Jerome Tucker et al.,* filed on December 16, 2016 in the United States District Court, District of Kansas, Case No. 2:16-cv-02816. According to the FTC, the hundreds of counterfeit debt portfolios sold by Mr. Tucker and his companies listed millions of loans that were never made or that Mr. Tucker and his companies did not own and had no right to collect.

20. On June 5, 2018, the United States of America filed a twelve count indictment against Joel Jerome Tucker in the United States District Court, Western District of Missouri,

Western Division, Case No. 18-00153-01-CR-W-RK, for various felonies, all stemming from Mr. Tucker's payday loan, credit identity theft scheme. Mr. Tucker's jury trial is set for April 20, 2020.

21. Mr. Tucker: (a) created multiple counterfeit accounts regarding Mr. Tolliver, (b) included Mr. Tolliver's counterfeit accounts in multiple portfolios containing thousands of other counterfeit accounts, and (c) sold the portfolios of counterfeit accounts to multiple debt buyers, debt brokers and debt collectors around the country.

22. To this day, Mr. Tolliver's personal and financial information has been periodically and repeatedly sold and resold to dozens of entities who have used that information to create fake accounts and repeatedly contact Mr. Tolliver and his relatives, and threaten Mr. Tolliver with arrest, criminal prosecution, civil litigation, liens, garnishments, and other adverse consequences, in efforts to extort the payment of money from Mr. Tolliver based on fake accounts and made-up debts that Mr. Tolliver does not owe and that the perpetrators have no right to collect.

23. The yet-to-be identified defendant named in this lawsuit, using the name "Absolute," along with its owners, employees and agents, is the most recent group of credit identity thieves to obtain and use Mr. Tolliver's stolen account, personal and financial information, to contact and falsely threaten Mr. Tolliver with litigation, prosecution and other adverse consequences, in efforts to coerce Mr. Tolliver into paying money.

24. In May of 2019, defendant and its employees and agents placed a call from a blocked number to Mr. Tolliver's residential telephone and left the following pre-recorded, computer-generated message on Mr. Tolliver's telephone answering machine: "This is Mr. Hagwood. This confidential message is intended for Bill Tolliver BH693837. Bill Tolliver

BH693837. We have made multiple attempts to reach you in reference to a progress of your complaint status. The listed just given hasn't complied. This will be the last attempt to reach you. We have received a motion of due diligence to perform location verification at your place of employment or physical address. If you wish to schedule an alternate location, please call 855-203-0275. Again 855-203-0275 regarding this matter. We will be expecting your call."

25. In May of 2019, defendant and its employees and agents placed another call from a blocked number to Mr. Tolliver's residential telephone and left the following pre-recorded, computer-generated message on Mr. Tolliver's telephone answering machine: "This is Mr. Benson. This confidential message is intended for Bill Tolliver BH693837. BH693837. We have made multiple attempts to reach you both by mail and telephone regarding your credit information on file. This file has been replaced under managers review to exhaust every avenue possible to have you notified of this matter. I will be attempting to complete location verification at your place of employment or residence. To schedule an alternate location please call 855-230-4689."

26. In May or June of 2019, Mr. Tolliver spoke by telephone with defendant's employee and agent who identified herself as "Ms. Richardson" with "Absolute," and a telephone number of 855-203-4819. In the ensuing conversation, defendant's employee and agent made the following representations:

a) Mr. Tolliver obtained a payday loan in or about 2009 from Check Into Cash, with an account number ending in 1898.

b) Mr. Tolliver failed to repay the loan and the account has been delinquent for more than six years.

c) Mr. Tolliver had breached his contract with Check Into Cash, wrote a bad

check, and defrauded a financial institution.

d) Mr. Tolliver currently owed $965.00 to Check Into Cash.

e) Absolute is a law firm, hired by Check Into Cash to file a lawsuit against Mr. Tolliver to collect the debt.

f) Absolute had filed a lawsuit on behalf of Check Into Cash and against Mr. Tolliver to collect the debt.

g) If Mr. Tolliver did not agree to pay money to Absolute, the court would enter judgment against Mr. Tolliver in the amount of $1,774.00 and Absolute would place a lien against Mr. Tolliver's residence.

27. Defendant and its employees and agents failed and refused to provide Mr. Tolliver with defendant's true and complete name, business address, or email address.

28. The only information that Mr. Tolliver has to identify and sue defendant and its employees and agents is the three telephone numbers used by defendant and its employees and agents to contact and falsely threaten Mr. Tolliver.

29. Mr. Tolliver has never had an account with Check Into Cash. Mr. Tolliver has never borrowed money from Check Into Cash. Mr. Tolliver denies owing any money to Check Into Cash or any other entity in connection with the alleged account.

30. On October 18, 2019, Check Into Cash confirmed to Mr. Tolliver and Mr. Tolliver's legal representative that Mr. Tolliver has never had an account with Check Into Cash, and that any attempt by an entity, including "Absolute," to collect an alleged debt from Mr. Tolliver for the benefit of Check Into Cash was fraudulent.

31. The above-described threats and representations made by defendant and its

employees and agents were false and part of a scripted and unlawful debt collection practice that is ongoing and is currently being perpetrated by defendant to coerce the payment of money from thousands of consumers across the country through the use of false threats of litigation and prosecution, intimidation, and unlawful harassment, often times on debts that are not owed and through the use of consumers' stolen account and personal information.

32. Defendant and its employees and agents failed to meaningfully identify themselves and their companies.

33. Defendant and its employees and agents falsely represented the amount of Mr. Tolliver's alleged debt.

34. Defendant and its employees and agents falsely represented that Mr. Tolliver owed a debt that is not owed.

35. Defendant and its employees and agents falsely represented the identity of the entity to whom the alleged debt is owed.

36. Defendant and its employees and agents falsely represented that they are a attorneys and a law firm.

37. Defendant and its employees and agents wrongfully obtained and wrongfully used information related to a counterfeit account, as well as Mr. Tolliver's personal and financial information, in an effort to coerce the payment of money from Mr. Tolliver.

38. Defendant and its employees and agents falsely represented and falsely implied that lawyers were involved in the efforts to collect the alleged debt.

39. Defendant and its employees and agents falsely represented and falsely implied that a lawsuit had been filed against Mr. Tolliver to collect the alleged debt.

40. Defendant and its employees and agents falsely represented and falsely implied that Mr. Tolliver had committed a crime.

41. Defendant and its employees and agents falsely represented and falsely implied that Mr. Tolliver was going to be prosecuted.

42. Defendant and its employees and agents falsely represented and falsely implied that Mr. Tolliver had defrauded defendant's "client" and written a "bad check."

43. Defendant and its employees and agents wrongfully threatened, and falsely represented and falsely implied, that if Mr. Tolliver did not pay money to defendant, a judgment would be entered against Mr. Tolliver and defendant would place a lien on Mr. Tolliver's property.

44. Defendant did not intend to file a lawsuit against Mr. Tolliver in any court in efforts to collect the alleged debt.

45. The FDCPA states that it is unlawful for a debt collector to engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of any debt. 15 U.S.C. § 1692d.

46. The FDCPA states that it is unlawful for a debt collector to use criminal means to harm the reputation of any person. 15 U.S.C. § 1692d(1).

47. The FDCPA states that it is unlawful for a debt collector to place a telephone call without meaningful disclosure of the caller's identity. 15 U.S.C. § 1692d(6).

48. The FDCPA states that it is unlawful for a debt collector to falsely represent or imply that the debt collector is vouched for or affiliated with the United States or any State. 15 U.S.C. § 1692e(1).

49. The FDCPA states that it is unlawful for a debt collector to make any false representation regarding the character, amount, or legal status of any debt. 15 U.S.C. § 1692e(2)(A).

50. The FDCPA states that it is unlawful for a debt collector to make any false representation regarding the compensation which may be lawfully received by any debt collector for the collection of any debt. 15 U.S.C. § 1692e(2)(B).

51. The FDCPA states that it is unlawful for a debt collector to falsely represent or imply that any individual is an attorney or that any communication is from any attorney. 15 U.S.C. § 1692e(3).

52. The FDCPA states that it is unlawful for a debt collector to falsely represent or imply that nonpayment of any debt will result in the arrest or imprisonment of any person or the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action. 15 U.S.C. § 1692e(4).

53. The FDCPA states that it is unlawful for a debt collector to threaten to take any action that cannot legally be taken or that is not intended to be taken. 15 U.S.C. § 1692e(5).

54. The FDCPA states that it is unlawful for a debt collector to falsely represent or imply that the consumer committed a crime or other conduct in order to disgrace the consumer. 15 U.S.C. § 1692e(7).

55. The FDCPA states that it is unlawful for a debt collector to communicate to any person credit information which is known or which should be known to be false. 15 U.S.C. § 1692e(8).

56. The FDCPA states that it is unlawful for a debt collector to use any false representation or deceptive means to collect or attempt to collect any debt. 15 U.S.C. § 1692e(10).

57. The FDCPA states that it is unlawful for a debt collector to communicate in a communication with a consumer to fail to disclose that the communication is from a debt collector. 15 U.S.C. § 1692e(11).

58. The FDCPA states that it is unlawful for a debt collector to falsely represent or imply that documents are legal process. 15 U.S.C. § 1692e(13).

59. The FDCPA states that it is unlawful for a debt collector to use any business, company, or organization name other than the true name of the debt collector's business, company, or organization. 15 U.S.C. § 1692e(14).

60. The FDCPA states that it is unlawful for a debt collector to use unfair or unconscionable means to collect or attempt to collect any debt. 15 U.S.C. § 1692f.

61. The FDCPA states that it is unlawful for a debt collector to collect any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law. 15 U.S.C. § 1692f(1).

62. Defendant and its employees and agents have violated the FDCPA, 15 U.S.C. §§ 1692c, 1692d, 1692d(1) and (6), 1692e, 1692e(1), (2)(A), (2)(B), (3), (4), (5), (7), (8), (10), (11), (13) and (14), and 1692f and 169f(1).

63. The FDCPA requires that, within five days of the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the required information is contained in the initial communication or the consumer has paid the debt, send the

consumer a written notice containing the information mandated by 15 U.S.C. § 1692g(a).

64. Defendant and its employees and agents failed to timely send to Mr. Tolliver a notice containing the information required by 15 U.S.C. § 1692g(a).

65. As an actual and proximate result of the acts and omissions of defendant and its employees and agents, plaintiff has suffered actual damages and injury, including but not limited to, monetary loss, fear, stress, mental anguish, emotional stress, acute embarrassment, anxiety, loss of sleep, and suffering, for which he should be compensated in an amount to be established by jury and at trial.

## V. Claims for Relief

### Count 1 – Fair Debt Collection Practices Act

66. Plaintiff incorporates the foregoing paragraphs by reference.

67. Defendant has violated the FDCPA. Defendant's violations of the FDCPA include, but are not necessarily limited to, the following:

a) Defendant violated 15 U.S.C. § 1692d by engaging in conduct, the natural consequence of which is to harass, oppress, or abuse a person in connection with the collection of a debt;

b) Defendant violated 15 U.S.C. § 1692e by using false, deceptive and misleading representations and means in connection with the collection or attempted collection of a debt;

c) Defendant violated 15 U.S.C. § 1692f by using unfair and unconscionable means to collect or attempt to collect a debt from plaintiff; and

d) Defendant violated 15 U.S.C. § 1692g.

**Wherefore,** plaintiff seeks judgment against defendant for:

a) Actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

b) Statutory damages pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c) Costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3); and

d) Such further relief as the court deems just and proper.

Dated: October 18, 2019

/s/ Phillip C. Rogers
Phillip C. Rogers (P34356)
Attorney for Plaintiff
6140 28th Street SE, Suite 115
Grand Rapids, Michigan 49546-6938
(616) 776-1176
ConsumerLawyer@aol.com